**ESTATE OF William F. McALLISTER, Deceased; Sharon McAllister; Sean McAllister; and Lori McAllister, individually, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 90–35184.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1991.

Decided Aug. 28, 1991.

**1474**

L.E. Ashcroft, Rhoten, Speerstra, Rinehart & Ashcroft, Salem, Or., for plaintiffs-appellants.

Steven Bransdorfer, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before GOODWIN, THOMPSON and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

The estate and heirs of William McAllister appeal from the district court's dismissal of their wrongful-death action under the *Feres* doctrine. *See Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). We must affirm.

I

On New Year's Eve five years ago, Private Leon Tarver attacked, stabbed, and killed Lieutenant Colonel William McAllister near the Post Exchange ("PX") on the premises of the Presidio in San Francisco, California.[1] "It is undisputed that [Lieutenant Colonel] McAllister was off duty and not under [the] compulsion of [military] orders at the time of his death. He was not performing any military duties, was on personal business, and [was] in the process of leaving the base." *Estate of McAllister v. United States*, No. 89–6150 at 3 (D.Or. Dec. 6, 1989) (magistrate's findings and recommendation), *adopted by* No. 89–6150 (D.Or. Dec. 28, 1989) (order of dismissal).

At the time of the killing, Private Tarver, on the other hand, was under the government's care and supervision as a patient of the Letterman Army Hospital on the Presidio grounds. Tarver, who had been diagnosed while serving in Germany as a paranoid schizophrenic with potentially dangerous tendencies, had been assigned to the Letterman Hospital for treatment and evaluation in March 1986. Three months later, the Army reassigned Tarver to active duty in South Korea, but he was again diagnosed as schizophrenic and potentially dangerous and was transferred back to the Letterman Hospital in October 1986, where he remained through the date of the murder.

Charging the Army with medical malpractice in its supervision of Private Tarver, the estate and heirs of Lt. Col. McAllister filed suit under the Federal Tort Claims Act ("FTCA") on April 25, 1989. The

---

**1.** "Because this case involves an appeal from an order dismissing for want of jurisdiction, we accept as true the factual allegations contained in appellants' complaint. *Broudy v. United States*, 661 F.2d 125, 126 n. 1 (9th Cir.1981)." *Persons v. United States*, 925 F.2d 292, 294 n. 1 (9th Cir.1991).

government subsequently filed a motion to dismiss for lack of subject matter jurisdiction pursuant to the *Feres* doctrine, and the district court granted that motion upon the recommendation of a federal magistrate on December 28, 1989. The estate and heirs then filed this timely appeal.

## II

The presence or absence of subject matter jurisdiction under the FTCA, 28 U.S.C. §§ 1346(b), 2671–80, is a question of law reviewable de novo. *See Atkinson v. United States*, 825 F.2d 202, 204 (9th Cir. 1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1288, 99 L.Ed.2d 499 (1988). In the process of reviewing that question, the court must "review independently the question whether the *Feres* doctrine is applicable to the facts reflected in the record." *McGowan v. Scoggins*, 890 F.2d 128, 129 (9th Cir. 1989); *see also Persons v. United States*, 925 F.2d 292, 294 (9th Cir.1991) (quoting same).

## III

### A

The FTCA provides in relevant part that:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances....

28 U.S.C. § 2674 (1988). As a specific exception to this general waiver of sovereign immunity, the Act provides that the government shall not be liable for "[a]ny claim arising out of the *combatant* activities of the military or naval forces, or the Coast Guard, *during time of war.*" *Id.* § 2680(j) (emphasis added). Notwithstanding the explicit terms of this latter provision, the Supreme Court has determined that the military exception to the Act's waiver of immunity is considerably broader than this provision suggests. Upholding decisions to dismiss an action by the heirs of a soldier who had perished by fire in the barracks of an Army camp "while on active duty in service of the United States," the Court unanimously held in 1950 that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity *incident to service.*" *Feres*, 340 U.S. at 137, 146, 71 S.Ct. at 155, 159 (emphasis added).

The Court reached the same conclusion in two other cases that were consolidated and decided along with *Feres: Jefferson v. United States* and *United States v. Griggs*. Like the present case, both of these cases involved allegations of medical malpractice by Army doctors. In *Jefferson*, a soldier who had received an abdominal operation in an Army hospital brought suit on his own behalf when, "eight months later, in the course of another operation after [he had been] discharged, a towel 30 inches long by 18 inches wide, marked 'Medical Department U.S. Army' was discovered and removed from his stomach." *Id.* at 137, 71 S.Ct. at 155. In *Griggs*, the executrix of a soldier's estate alleged that "while on active duty [the soldier had] met death because of negligent and unskillful medical treatment by army surgeons." *Id.* In the Court's view, "[t]he common fact underlying the three cases [was] that each claimant, while on active duty and not on furlough, [had] sustained injury due to negligence of others in the armed forces." *Id.* at 138, 71 S.Ct. at 156. Under such circumstances and in light of the fact that Congress created separate statutory schemes to compensate for the deaths and injuries of armed services personnel, the Court concluded that there could be no government liability under the FTCA. *See id.* at 144, 71 S.Ct. at 158.

The *Feres* doctrine, as the rule of these three cases has come to be known, is highly controversial. It has been criticized "by countless courts and commentators," including this court. *Persons*, 925 F.2d at 295. Some have found fault with the Court's creation of a judicial exception to a clear statutory pronouncement and the unfairness that the rule has often produced. *See, e.g., United States v. Johnson*, 481 U.S. 681, 700, 107 S.Ct. 2063, 2074, 95 L.Ed.2d 648 (1987) (Scalia, J., dissenting and joined by Brennan, Marshall, and Ste-

vens, JJ.) ("*Feres* was wrongly decided and heartily deserves the 'widespread, almost universal criticism' it has received.") (citation omitted); *id.* at 703, 107 S.Ct. at 2075 (urging Court to "limit our clearly wrong decision in *Feres* and confine the unfairness and irrationality that decision has bred"); *Atkinson*, 825 F.2d at 206; *id.* at 206–07 (Noonan, J., concurring); *Atkinson*, 804 F.2d 561 (9th Cir.1986), *withdrawn by*, 825 F.2d 202. Others have found fault with the essential vagueness and ambiguity of the doctrine itself. *See, e.g., Millang v. United States*, 817 F.2d 533, 535 (9th Cir.1987) (per curiam) (noting the "somewhat elusive 'incident to service' standard"), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988); *Monaco v. United States*, 661 F.2d 129, 132 (9th Cir.1981) (noting that "the basis for the exception has recently become the subject of some confusion"), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *Persons*, 925 F.2d at 295 (citing *Millang* and *Monaco* and noting that "it is entirely unclear which of the doctrine's original justifications survive"). A comparison of reasoning with outcomes in cases that have applied the doctrine validates these concerns: the results have not flowed easily from the doctrine's purported rationales.

Nonetheless, the *Feres* doctrine remains the law of the land, and we must undertake to apply it.

### B

In the *Feres* case itself, the Supreme Court enunciated two rationales for the "intramilitary immunity" exception to the FTCA's waiver. Twenty-seven years later, the Court enunciated a third. *See Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2057–58, 52 L.Ed.2d 665 (1977). As we recently explained in *Persons*, these three rationales are:

"(1) the distinctively federal nature of the relationship between the government and members of its armed forces, which argues against subjecting the government to liability based on the fortuity of the situs of the injury; (2) the availability of alternative compensation systems [for military personnel and their families]; and (3) the fear of damaging the military disciplinary structure."

925 F.2d at 294–95 (quoting *Atkinson*, 825 F.2d at 204).

In *United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), however, the Supreme Court stated that "[t]he *Feres* doctrine cannot be reduced to a few bright-line rules," thereby eviscerating any hope that a simple application of these three rationales to the facts at hand might produce the proper result. *Id.* 473 U.S. at 57, 105 S.Ct. at 3042. The *Shearer* Court explained that:

Although the Court in *Feres* based its decision on several grounds, "[i]n the last analysis, *Feres* seems best explained by the 'peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty.'"

*Id.* (quoting *United States v. Muniz*, 374 U.S. 150, 162, 83 S.Ct. 1850, 1857, 10 L.Ed.2d 805 (1963) (quoting *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954))). The *Shearer* Court went on to explain that the first two rationales—the only two mentioned in the *Feres* opinion itself—were "no longer controlling," leaving only the military-discipline rationale as a reason for invoking the *Feres* bar. *Id.* 473 U.S. at 58 n. 4, 105 S.Ct. at 3043 n. 4; *see also Persons*, 925 F.2d at 295 (citing *Shearer* and noting same).

Only two years later, however, the Supreme Court appeared to reverse course in *United States v. Johnson*, 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987), reasserting the relevance and validity of all three purported rationales over the vociferous dissent of four Justices who were inclined to abandon the doctrine altogether. *See id.* at 684 n. 2, 688–691, 107 S.Ct. at 2065 n. 2, 2067–69. Precisely how a court should apply the *Feres* doctrine to the facts of a given case, therefore, remains unclear.

A reconciliation of prior pronouncements on the subject is not possible.[2]

## IV

When presented with conflicting messages from the Supreme Court, lower courts have typically resorted to comparing fact patterns in previous cases with that in the case before them in an effort to produce the most appropriate outcome. Although intellectually unsatisfying, a comparison of fact patterns to outcomes in cases that have applied the *Feres* doctrine compels the conclusion that the rule bars the appellants' action here.

## A

As an initial matter, we must consider the decisions in *Jefferson* and *Griggs*, the two companion cases that accompanied *Feres*. There, the Supreme Court held that the *Feres* rationales barred claims of medical malpractice when the treatment complained of was provided by military surgeons. *Feres*, 340 U.S. at 137, 146, 71 S.Ct. at 155, 159. Because appellants seek to escape operation of the *Feres* doctrine by characterizing their claim as a medical malpractice claim, reference to *Jefferson* and *Griggs* alone suffices to repudiate that distinction.

Appellants purport to differentiate *Jefferson, Griggs*, and *Feres* by relying upon *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), which the Supreme Court decided one year earlier. There, the Court held that "members of the United States armed forces can recover under th[e Federal Tort Claims] Act for injuries *not* incident to their service." *Id.* at 50, 69 S.Ct. at 919 (emphasis added). In *Brooks*, two brothers who were members of the armed services were struck by a military-owned vehicle driven by a civilian employee of the Army while they were out on furlough and driving along a public highway. The Court held that the subsequent tort suit could proceed. When the Court decided *Jefferson, Griggs*, and *Feres*

one year later, it did not overrule *Brooks;* rather, as appellants point out, the Court distinguished the earlier case:

> The injury to Brooks did not arise out of or in the course of military duty. Brooks was on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission. A government owned and operated vehicle collided with him. Brooks' father, riding in the same car, recovered for his injuries and the Government did not further contest the judgment but contended that there could be no liability to the sons, solely because they were in the Army. This Court rejected the contention, primarily because Brooks' relationship while on leave was not analogous to that of a soldier injured while performing his duties under orders.

*Feres*, 340 U.S. at 146, 71 S.Ct. at 159. Arguing that McAllister was similarly off duty and under the compulsion of no military orders at the time of his death, appellants contend that their case is more like *Brooks* than it is like *Jefferson* or *Griggs*.

If the evolution of the *Feres* doctrine had stopped in 1950, appellants would have the better argument. Subsequent cases, however, have expanded greatly the factual circumstances under which the conduct of military personnel will be deemed "incident to service." As the government correctly points out, the facts in this case are strikingly analogous to the facts in *Shearer*, where the Supreme Court also found a *Feres*-based bar to suit. When he was off duty and away from his base, United States Army Private Vernon Shearer was kidnapped and murdered by another serviceman, Private Andrew Heard. Shearer's mother, as administratrix of his estate, brought suit against the United States under the FTCA. She alleged that the Army's negligence had caused her son's death. Prior to the murder, Heard had served in Germany, where he had been convicted of manslaughter by a German court and sentenced to a four-year prison

---

**2.** For an exhaustive analysis of the "evolution" of this troubled doctrine, *see McGowan v. Scog-* *gins*, 890 F.2d 128, 129–36 (9th Cir.1989).

term. After Heard served his term, the Army transferred him to Fort Bliss, where he eventually killed Private Shearer. In her suit, Mrs. Shearer alleged that the Army had been fully aware of Heard's dangerous nature and had been negligent in failing to control him and in failing to warn others about him. *Shearer,* 473 U.S. at 53–54, 105 S.Ct. at 3040–41. The Supreme Court, however, ordered dismissal of the suit, holding that allowing the action to proceed would infringe impermissibly upon the military's command and disciplinary decisions with respect to its personnel. *Id.* at 58–59, 105 S.Ct. at 3043–44.[3]

The present facts are also substantially similar to the facts in *Persons,* where this court very recently found a *Feres*-based bar to suit. In *Persons,* the estate and heirs of a naval officer brought suit against the government alleging medical malpractice on the part of the physicians and staff of a military hospital. The decedent had presented himself to the hospital's emergency room with "seven deep slash marks on each of his wrists [that] bore witness to his deeply distressed emotional state and attested to his attempted suicide." 925 F.2d at 294. Apparently, "[a]fter a few hours, and without being admitted to the hospital for observation, he was released. Some three months later, on December 23, 1987, Kelly Persons committed suicide." *Id.* The claimants contended that the hospital's doctors had been negligent in failing to provide Persons with adequate counseling or treatment. Admitting its reluctance but acknowledging its obligation, this court affirmed dismissal of the claims pursuant to *Feres. Id.* at 299.[4]

We must do the same. There is no meaningful difference between the facts in *Persons,* where a serviceman's mental disorder and the alleged negligence of a military hospital in treating it resulted in the death of that serviceman by suicide, and the facts in the case before us, where a serviceman's mental disorder and the alleged negligence of a military hospital in treating it resulted in the death of *another* serviceman at the hands of the first.

Appellants, however, argue otherwise. They purport to distinguish *Persons* on the basis of the fact that in *Persons* the decedent serviceman was *himself* the alleged victim of medical malpractice, whereas here the decedent serviceman was the victim of a failure to control a *second,* mentally disturbed serviceman. Because McAllister was not the army hospital patient himself, they point out, the nexus between the victim and the various benefits and obli-

---

**3.** In its brief, the government has set forth an instructive comparison between the language in Mrs. Shearer's complaint and the language in appellants' complaint. The critical passages are nearly identical:

> Respondent's complaint strikes at the core of [the *Feres* ] concerns. In particular, respondent alleges that Private Shearer's superiors in the Army "negligently and carelessly failed to exert a reasonably sufficient control over Andrew Heard, ... failed to warn other persons that he was at large, [and] negligently and carelessly failed to ... remove Andrew Heard from active military duty." This allegation goes directly to the "management" of the military; it calls into question basic choices about the discipline, supervision, and control of a serviceman.

*Shearer,* 473 U.S. at 58, 105 S.Ct. at 3043 (footnotes and citation omitted).

> The direct and proximate cause of the death of the decedent was the negligence of the defendant, the Department of the Army and its agents and employees[,] in carelessly, wrongfully and negligently failing to properly supervise, control and treat said Private Tar-

ver and in failing to otherwise protect the decedent, William F. McAllister, from said Private Leon Tarver when defendant, it's [sic] employees and agents knew or should have known that Private Tarver posed a foreseeable risk of harm to the public. The supervision, control and treatment of said Private Leon Tarver did not require defendants, employees, and agents to exercise complex, subtle, and professional judgment as to composition, training[,] equipping and controlling of a military force.

*Estate of McAllister v. United States,* Complaint at ¶ 10.

**4.** The court in *Persons* affirmed dismissal of the medical malpractice claims only to the extent that those claims related to the treatment of the decedent. The court reversed and reinstated a claim that the government had been negligent in failing to provide psychological counseling to the decedent's *family* in the aftermath of his suicide. The court held that *Feres* did not bar this latter claim. *See* 925 F.2d at 297–99. Appellants have not alleged such a claim in their complaint here.

gations "incident to military service" is more strained in this case.

This argument has intuitive appeal, and if the legal slate were clean, it might carry the day. Unfortunately for appellants, however, this factual distinction cannot overcome the breadth of the *Feres* rule as it has been applied in prior decisions. In *Millang*, for example, this court held that the *Feres* doctrine barred an action by an officer who was run over by a military police vehicle while off duty and attending a picnic. The court found that the accident arose out of activity incident to service because Millang's presence at and use of the picnic area hinged on his military status and because the *tortious driver* was an officer acting subject to military command. 817 F.2d at 534–35. Similarly, in *Bon v. United States*, 802 F.2d 1092 (9th Cir.1986), this court held that *Feres* barred a claim by a servicewoman who, while paddling a canoe rented from a naval facility, was struck and injured by a motor boat operated by another service member. The court found the motor boat operator's status as a member of the military "subject to discipline" relevant to its decision. *Id.* at 1095. Given *Millang* and *Bon*, the difference between *Persons* and the present appeal cannot alter the outcome.

### B

Even putting *Shearer* and *Persons* aside, virtually every other significant precedent suggests that the *Feres* doctrine bars appellants' suit. For example, in *Atkinson*, this court held that a servicewoman could not pursue a claim for allegedly negligent prenatal care received at a military hospital while she was on active-duty status. The court explained that even though the lawsuit did not implicate concerns of military discipline or encroach upon " 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' " the broad reach of the *Feres* doctrine nonetheless precluded the action. *Atkinson*, 825 F.2d at 205 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973)). Similarly, in *Veillette v. United States*, 615 F.2d 505 (9th Cir.1980), this

court held that the parents of an Air Force serviceman who had been treated at a naval hospital after an off-duty motorcycle accident could not sue the government for the alleged negligence of the hospital's doctors and employees. In the court's view, it was immaterial that Veillette had been off duty at the time of the accident; that he had been a member of the Air Force and not a member of the Navy; and that the treating naval hospital attended to both civilian and military personnel. As the court explained, "allegations of medical malpractice, the basis of two of the claims rejected in *Feres*, have consistently been held to fall within the bounds of the doctrine when the plaintiff was a serviceman on active duty at the time of the alleged malpractice." 615 F.2d at 507 (citing numerous cases); *see also Persons*, 925 F.2d at 296 ("In this Circuit, *Atkinson* ... and *Veillette* ... are controlling.").

### C

Regardless of the merits of the *Feres* doctrine or the persuasiveness of its rationales, there is no doubt that it provides a broad blanket of immunity to protect the government against allegations of negligence in military contexts:

> For all the complexity of the evolution of the doctrine, ... what is *not* unclear and escapes all current confusion is its overall trend. From *Brooks*, 337 U.S. 49 [69 S.Ct. 918], the first Supreme Court case addressing an FTCA suit brought by a service person, to *United States v. Johnson, supra*, jurisprudence has been guided by an increasing sense of awe for things military. As a result, practically any suit that "implicates the military judgments and decisions," *id.* [481 U.S.] at 691 [107 S.Ct. at 2069], runs the risk of colliding with *Feres*.

*Id.* at 295 (emphasis in original). As the Sixth Circuit has observed:

> Review of the [ ] Supreme Court precedents makes it clear that in recent years the Court has embarked on a course dedicated to broadening the *Feres* doctrine to encompass, at a minimum, *all* injuries suffered by military personnel that are

even remotely related to the individual's *status* as a member of the military, without regard to the location of the event, the status (military or civilian) of the tortfeasor, or any nexus between the injury-producing event and the essential defense/combat purpose of the military activity from which it arose.

*Major v. United States,* 835 F.2d 641, 644–45 (6th Cir.1987) (emphasis in original), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 906 (1988); *see Johnson,* 481 U.S. 681, 107 S.Ct. 2063 (1987) (*Feres* doctrine barred heirs of Coast Guard pilot from maintaining wrongful death action based on negligence of civilian air traffic controllers); *United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (logic of *Feres* barred Army officer who was secretly administered doses of LSD from maintaining a *Bivens* action against the Army); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (logic of *Feres* bars enlisted military personnel from maintaining *Bivens* actions against their superior officers). Indeed, appellants have not been able to cite a single Supreme Court case in support of their position since *Brooks,* and we are aware of no such case.

### V

In light of the foregoing, we must affirm. In so doing, we follow a long tradition of reluctantly acknowledging the enormous breadth of a troubled doctrine. *See, e.g., Persons,* 925 F.2d at 299 ("Seemingly manacled by precedent, this Circuit has repeatedly expressed its strong reservations [about the *Feres* doctrine] before ultimately overcoming them.") (citing *Atkinson,* 825 F.2d at 206 (grudgingly reversing a prior decision in light of *Johnson* ), *Monaco,* 661 F.2d at 134 (confessing that "[t]he result in this case disturbs us ... If developed doctrine did not bind us we might be inclined to make an exception ... Unfortunately, we are bound"), and *Veillette,* 615 F.2d at 506 ("Reluctantly, we affirm")).

AFFIRMED.